## City of Paducah v. Jones.

May 27, 1941.

Wheeler & Shelbourne for appellant.

C. C. Grassham for appellee.

OPINION OF THE COURT BY JUDGE CAMMACK—Reversing.

This suit was instituted by the appellee, L. M. Jones, in August, 1936, against the Paducah Water Works Company (municipally owned), the City of Paducah, the Avondale Heights Company (a realty company), U. R. Bell and Muscoe Burnett (president of the Padu-

cah Water Company when privately owned). Jones sought to recover "his property right in 2621 feet of six inch pipe." The petition as amended was dismissed as to all the parties except the City, and judgment was entered against it in favor of Jones; hence this appeal.

Counsel for Jones states in his brief: "This suit was brought upon an express and implied contract." The pipe line in question is a part of the municipally owned water works system of Paducah. All of it lies beyond the city limits and was laid by Jones in 1926, or thereabouts. This pipe line has been kept up by the City for several years. The City, which purchased the water works system in 1930, has acquired other water lines beyond its limits. It has refused to trade with Jones, even though the city solicitor advised a course favorable to Jones on the question. Why such a course has been pursued is hard to understand, but that is not the question before us.

Our discussion of the case will be confined to its merits, and, therefore, we pass the questions of whether the City can be held upon an implied contract and of the alleged ultra vires act upon the part of the City in agreeing to purchase the pipe line beyond its limits (assuming that it did so agree). A consideration of the case makes it necessary to review briefly certain agreements and transactions between the privately owned Water Company and the Avondale Heights Company and Jones between 1913 and 1930. A record of some 600 pages, and briefs consisting of 160 printed pages, have been filed, but for the sake of brevity we will summarize the parts of the aforementioned agreements and transactions which we deem pertinent to a decision of the case.

The Avondale Company owned property outside the city limits in 1913. It desired to have a water main extended to a part of its property at that time. In that year the Water Company and the Realty Company entered into a contract under which the former was to lay, and it did lay, 3,000 feet of six inch pipe line for the Realty Company. The line was laid in accordance with the Water Company's rules and standards, and the Realty Company paid for the actual cost of laying the line. The Realty Company was given the privilege of connecting with the six inch pipe line at intersections under specified conditions. As to extensions the contract provided:

"* * * Should party of the second part desire to extend the six inch line of pipe above mentioned, on any street within its property it is agreed and understood that same shall be done by party of the first part, and the actual cost of such extensions shall be paid for by the party of the second part. * * *

"* * * It is also agreed and understood that the party of the second part shall not extend or permit any one to extend either the said six inch main or the lateral pipes without the written consent of the party of the first part."

The parties agreed that service connections should be made in accordance with the Water Company's rules and regulations and water was to be furnished to consumers through meters at the rates charged in the City. The contract contained a provision as to the installation of fire plugs in the event the territory through which the six inch line passed should become a part of the City. The Water Company was given the right of ingress and egress over the Realty Company's property to inspect and look after the water lines. Repairs were to be made at the expense of the Realty Company. That Company was to furnish ground for the installation of certain water equipment (a booster station), and it was to pay the cost of installation of that equipment. The contract contained the following provision as to the acquisition by the Water Company of the 3,000 feet of pipe line and the booster station:

"It is further agreed that within ten years after said pipe line shall have been laid and the water equipment shall have been installed, that the party of the first part shall have the right to buy and it is hereby agreed to buy, said six inch pipe line, or any six inch extensions, thereto at the price of seventy five per cent (75%) of its original cost, and thereafter to be the sole owner of same. At the same time, the party of the first part agrees to purchase the water equipment, and the party of the second part agrees to sell same to the party of the first part at the price of Sixty-six and two-thirds per cent (66 2/3%) of the original cost thereof, provided said water equipment shall, at such time, be of ample and sufficient capacity to supply the needs of

the then consumers of water connected with said pipe line; and should said water capacity, at the time specified be insufficient to furnish water to consumers then on said pipe line in ample and sufficient quantities and under sufficient pressure, then the party of the first part agrees to provide and install a water equipment which shall have sufficient capacity to supply the consumers on and connected with said pipe line.''

The lot and building which contained the booster station was to be deeded to the Water Company at the expiration of 10 years. This was done at or about that time. The parties further agreed that:

''It is further covenanted and agreed that the party of the first part shall have and shall hold the perpetual right to lay, maintain and operate a pipe line system for carrying on its business over and under and along all the streets and alleys of the tract of the land now owned or may hereafter be acquired by the Avondale Heights Company, and that a conveyance of such easement will be made and delivered to the party of the first part whenever demanded by party of the first part, its successors or assigns.''

The 3,000 feet of six inch pipe line were laid and the water equipment installed as agreed to by the parties, and in about 11 years (February, 1924) the Water Company took over the pipe line upon the payment to the Realty Company of the specified sum. The following receipt was signed by the president of the Water Company at that time:

''Received of the Paducah Water Company the sum of ($1544.53) Fifteen hundred, forty-four & 53/100 Dollars, as per attached itemized statement, paid under the terms of the contract between the Paducah Water Company and the Avondale Heights Company, dated June 12th, 1913.

''This sum is paid by the Paducah Water Company and received by the Avondale Heights Company in evidence of the fact that the Water equipment is at this time not of ample or sufficient capacity to supply the needs of the Consumers of Water connected with the water pipe line in Avondale Heights.

"In all other respects the contract between the Avondale Heights Company and the Paducah Water Company, dated June 12th, 1913, is hereby upheld, established and held to be in force and effect between the parties.

"This February 4th, 1924."

We deem it advisable to quote the 16th section of a franchise purchased by the Water Company in 1925, since the appellee stresses this provision, along with the receipt just quoted, in advancing his interpretation of a contract entered into between the Realty Company and the Water Company in 1926. Section 16 of the franchise reads:

"From the date that this Ordinance goes into effect, purchaser shall not supply water service to any person, persons or corporation or for any purpose whatsoever outside of the corporate limits of the City, from its properties within the City, without the approval of the City. It is understood and agreed, however, that nothing in this Ordinance shall operate to vitiate or abrogate any contract, or contracts, now in force between the purchaser and any person, persons or corporation without the City limits covering the furnishing of water service to such person, persons or corporation.

"Upon the expiration of any such contract, or contracts, however, purchaser shall not renew the same without the approval of the City. Furthermore, purchaser shall not, without the approval of the City, make, cause or allow to be made to any of its properties without the corporate limits of the City, any new addition or extension, or to attach any new consumers to present properties, or to furnish any service whatsoever not fully covered by existing contract or contracts."

The contract entered into in 1926 followed the purchase of certain property by Jones and Bell from the Realty Company. These parties desired to have the six inch water main extended so as to make water service available for that property.

In its 1926 contract the Water Company agreed that it would provide in a careful and prudent manner the material and cause to be installed a six inch water main along certain designated streets. All of this pipe line,

consisting of 3,696 feet, was outside the city limits. As to the charges for the installation of the pipe and the handling of tapping fees, the contract provided:

> "In consideration of the agreement and undertaking of the said Paducah Water Co. to provide the necessary piping and cause to be installed the water mains under, through and across the streets and road above mentioned the Avondale Heights Co. hereby covenants and agrees that it will pay to the Paducah Water Co. any and all money laid out or expended by the Paducah Water Co. and in addition 10% for supervision and providing material and causing to be laid the water mains over and under across and through the streets, road ways, and lanes above mentioned, that it will hold the Paducah Water Company harmless from any cost damage expense and liability of whatsoever kind arising from or connected with providing the material and the installation.

> "When said pipe line is constructed and paid for by the Avondale Heights Co. it is agreed that the same is and shall be the exclusive property of the Avondale Heights Co. and the Avondale Heights Co. shall have the fees and money paid by any one for tapping said system of pipes for the use of water."

On the same day that the Realty Company and the Water Company entered into the contract in 1926 the Realty Company entered into a contract with Jones and Bell under which the latter parties were to have the pipe line after they paid the Realty Company the cost of construction and installation and had held the Company harmless from all liability. This contract provided that the pipe line was to be the exclusive property of Bell and Jones and that they were to get the tapping fees.

Bell seems to have passed out of the picture, and, subsequently, 1927, Jones contracted with the Realty Company for the construction of an additional 420 feet of line. This 1927 contract recited that Jones was the owner of certain water lines and that the contemplated extension should, upon completion, become his property. The line was to be laid at the expense of the Realty Company.

The Paducah Water Company changed hands in 1928 and the deed of conveyance transferred to the purchaser the distribution system located within the City of Paducah and in the vicinity thereof. There was a covenant of general warranty subject to encumbrances of record. The 1913 contract between the Water Company and the Realty Company had been recorded in the county clerk's office. As heretofore mentioned, the City purchased the water works system in 1930. This deed made reference to a water distribution system within the city limits and in the vicinity thereof. The deed also provided that, "All rights, privileges, ordinances, concessions, easements, licenses, permits, liberties, annuities and franchises" owned by the private concern should be conveyed to the City. While negotiations were under way for the sale of the water system to the City it developed that 1,495 feet of the 3,696 feet of six inch line which were laid under the 1926 contract and which were then the property of Jones were within the city limits. This property was purchased by the Water Company from Jones in order that it might be conveyed to the City. For this 1,495 feet of line Jones was paid the sum of $2,033.20, which was at the rate of $1.36 per lineal foot, the price paid by Jones for the original installation of the pipe.

We deem it unnecessary to enter upon a discussion of negotiations between the parties after 1930 as to the purchase by the City of the 2621 feet of pipe involved in this litigation.

Acting upon the theory that the 1926 contract between the Water Company and the Avondale Company was merely supplemental to the one entered into in 1913, Jones instituted this action at the expiration of 10 years from the date of the 1926 contract. It can be seen from the foregoing quotations that he is relying upon the provisions of the 1913 contract relating to the taking over by the Water Company of the lines and extensions after 10 years at a price based upon three-fourths of the actual cost of construction. The finding of the chancellor was based upon such an interpretation of the contract. It is our conclusion, after a careful analysis of the contracts and a review of the circumstances relating to them, with due consideration given the receipt signed by Burnett in 1924, and Section 16 of the 1925 franchise, that the conclusion reached by the chancellor is errone-

ous. We think the 1926 contract, in so far as the laying of additional pipe was concerned, was a new and independent agreement between the parties. It is our view that the extensions referred to in the 1913 contract were extensions which might be made during the 10 year period referred to therein and were not extensions which might be made subsequent to the time the Water Company took over the pipe line under that agreement.

It is obvious from the foregoing review of the 1913 contract that there were certain parts of it which would continue, and, therefore, it did not terminate upon the taking over of the 3,000 feet of pipe line by the Water Company. The water equipment had proved to be inadequate and the Water Company did not take it over. The receipt set forth this fact and very properly provided that the original agreement in all other respects was ''upheld, established and held to be in force and effect between the parties.'' Whether permission from the City for the laying of· the pipe referred to in the 1926 contract was necessary, or was obtained, does not alter the case before us. Reference to the quoted part of the 1926 contract shows that that agreement expressly provided that the 3,696 feet of six inch line which were laid thereunder were to become the exclusive property of the Realty Company (later that of Jones). A new basis for paying for the installation of the pipe was provided, namely, the adding of 10 per cent for supervision. Furthermore, this agreement expressly provided that the Water Company was to be held harmless for any cost, damage, expense and liability of whatsoever kind arising from or connected with providing the material and the installation. Again, whereas the 1913 contract was silent as to tapping fees, the 1926 contract expressly provided that any such fees collected were to go to the Realty Company, which company transferred its rights to Jones.

There is conflict in the proof, of course, as to what was intended by the parties when the agreements were entered into in 1926, but we think the contracts speak for themselves, and, as pointed out above, we think the one entered into in 1926 is separate from and independent of the one entered into in 1913. There is proof to the effect that the six inch line laid under the 1926 agreement cost Jones some $4,700 and that, including the sum paid him by the Water Company in 1930 for the 1495

feet of line, he has received from tapping fees an amount approximating the original cost of the line to him. We have noted that the 420 foot extension was paid for by the Realty Company, though the line became the property of Jones. True it is that Jones is the owner of 2,621 feet of six inch water main, which are being used by the City of Paducah in furnishing water to certain consumers who live beyond the city limits. This piece of line, as we have pointed out, is maintained by the City, but it is obvious from what has been said that certain benefits have accrued to Jones. He got his money back for 1,495 feet of the pipe line, and he has received certain tapping fees in addition thereto. He entered into the contract with his eyes open, and, obviously, for his own advantage in developing the property which he and Bell purchased from the Realty Company. It goes without saying that the availability of water to those who contemplated building in the Avondale Heights section tended to increase the value of that property. There may or may not be other opportunities for the collection of tapping fees by Jones. But be this as it may, his rights in the pipe line are such as were provided in the 1926 contracts.

As pointed out in the beginning of this opinion, it seems rather ridiculous that the City would continue using 2,621 feet of privately owned pipe line in furnishing water to certain of its consumers, but this course it appears to have chosen. However, as we have indicated, the answer to the sole question before us, namely, whether Jones can collect from the City for his 2,621 feet of six inch pipe line on an express and implied contract, is in the negative.

Wherefore, the judgment is reversed with directions to set it aside and to enter a judgment in conformity with this opinion.